IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

TIMOTHY W. BURROW,                  )
                                    )
          Plaintiff/Appellant,      )  Sumner Circuit No. 18049-C
                                    )
VS.                                 )  Appeal No. 01A01-9806-CV-00311
                                    )
RUSSELL E. BARR, Individually       )
and d/b/a MAIN STREET MOTORS,       )
                                    )
          Defendant/Appellee.       )

FILED

September 17, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

APPEAL FROM THE CIRCUIT COURT OF SUMNER COUNTY
AT GALLATIN, TENNESSEE
THE HONORABLE THOMAS GOODALL, JUDGE

**G. KLINE PRESTON, IV**
Nashville, Tennessee
Attorney for Appellant

**ROLLIE L. WOODALL**
Nashville, Tennessee
Attorney for Appellee

**REVERSED AND REMANDED**

**ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**DAVID R. FARMER, J.**

This lawsuit arises from Timothy Burrow's purchase of a used car from Russell Barr

(d/b/a Main Street Motors), where, unbeknownst to Burrow, significant mechanical problems that greatly affected the car's value existed at the time of sale. In this appeal, Timothy Burrow appeals the trial court's *sua sponte* involuntary dismissal of his claims at trial, which occurred before Burrow was afforded the opportunity to fully present the facts and his evidence. Based upon the following, we reverse and vacate the trial court's dismissal, and remand this case to the trial court for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

This lawsuit was originally commenced in the Sumner County General Sessions Court by Burrow's filing of a civil warrant against Barr (hereafter either "Barr" or "Main Street Motors"), whereby Burrow alleged that Main Street Motors sold to Burrow "a 1988 Acura Legend ... on or about April 12, 1997 ... with defects that were known to [Barr] and were not known to [Burrow]." Burrow claimed, among other things, that Barr violated the Tennessee Consumer Protection Act[1] ("the TCPA"), and sought a judgment for actual damages,[2] treble damages,[3] and attorney fees.[4] After Burrow's claims were dismissed with prejudice in the General Sessions Court after a trial, Burrow appealed to the Sumner County Circuit Court for a *de novo* trial. In the circuit court, Barr counterclaimed for the recovery of any damages incurred, including reasonable attorney fees and costs, that

---

1. See Tenn. Code Ann. §§ 47-18-101 *et seq.* (1995 & Supp. 1998). More specifically, Burrow explained at trial that he claimed Barr had violated Tennessee Code Annotated sections 47-18-104(b)(7) and (b)(27), which provide:

> [T]he following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:
> . . .
>      (7) Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;
> . . .
>      (27) Engaging in any other act or practice which is deceptive to the consumer or to any other person.

Tenn. Code Ann. § 47-18-104(b) (Supp. 1998).

2. See Tenn. Code Ann. § 47-18-109(a)(1) (providing for the recovery of actual damages resulting from "the use or employment ... of an unfair or deceptive act or practice declared to by unlawful" by the TCPA).

3. See Tenn. Code Ann. § 47-18-109(a)(3) & (4) (providing for the recovery of treble damages where "the unfair or deceptive act or practice was a willful or knowing violation" of the TCPA).

4. See Tenn. Code Ann. § 47-18-109(e)(1) (establishing that the trial court may award the person bringing a TCPA claim reasonable attorney fees and costs).

resulted from defending this action.[5]

Prior to the circuit court trial, Burrow subpoenaed three witnesses: Steve Bowman, Tim Durbin, and Melanie Barr.[6] Furthermore, he filed a witness list that provided that he may call any or all of the following witnesses: Burrow, Barr, Steve Bowman, Tim Durbin, Melanie Barr, Rick Meadows, Phillip Urrutia, and Tony Adgent. On May 21, 1998, the case came to be heard by the circuit court, at which time each party presented opening statements, and Burrow began presentation of his case in chief. At this time, Burrow presented testimony from both Burrow and Steve Bowman.

During the course of Burrow's direct examination by his counsel, Burrow testified that, prior to April 12, 1997, he spoke with Tim Durbin, who is an employee at Main Street Motors. Burrow asked what kind of shape the 1988 Acura Legend was in, and Durbin stated that it was in good shape.[7] On April 12, 1997, Burrow went to Main Street Motors and met with Rick Meadows, who is another Main Street Motors employee. While there, Burrow looked at another vehicle, a Mercedes, at which time the following oral exchange occurred:

> And Rick Meadows -- I said to Rick, "I'm a little concerned about the maintenance of the car." He said, "Yeah." He said, "That kind of concerns me, too." He said, "Well, you know how much you'll have to pay in maintenance on an Acura." And I said, "How much?" And he said, "Nothing."
> And, you know, I realize that was sales puffing; but still, it was consistent with Tim Durbin's statement that it was a good car.
> So I was kind of eager to drive the car. And also, Mr. Meadows volunteered information that they had bought the Acura from Gary Force [Acura].
> . . . .
> So then I thought, well, why did Gary Force sell it? And so I asked him if Gary Force only sells cars that they don't want, or do they sell all their old cars? He said, "Oh, they sell all of them." So I thought, all right, that's fine, it could still be an excellent car.

---

5. See Tenn. Code Ann. § 47-18-109(e)(2) (establishing that the trial court may award a defendant any damages incurred, including reasonable attorney fees and costs, resulting from the defense of a TCPA claim that was "frivolous, without legal or factual merit, or brought for the purpose of harassment").

6. Presumably, Melanie Barr is Russell Barr's wife, who supposedly drove the Acura Legend during the time period when it was in Main Street Motors's possession.

7. The mileage of the 1988 model car did, however, exceed 136,000 miles. Further, Burrow later admitted during cross-examination that he assumed that Durbin's characterization (that he thought it was a good car) was just Durbin's opinion.

During this exchange, the 1988 Acura Legend had been out being test driven by another potential customer. After the car was returned, Burrow test drove it. "It drove well. .... [I]t really ran very smoothly." Meadows did, however, inform Burrow, "there's a CV joint that needs to be replaced." Thereafter, Burrow negotiated an agreement, whereby "the final deal was: $5,400 if they fixed the CV joint and if they put stripes on it. .... Plus tax, it was $5,788.50." At the time of the purchase, Burrow received an "invoice and bill of sale" that stated "AS-IS." Moreover, Burrow signed a "buyers guide" that was attached to the bill of sale, which stated:

> IMPORTANT: Spoken promises are difficult to enforce. Ask the dealer to put all promises in writing.
> . . . .
> ### AS IS - NO WARRANTY
>
> YOU WILL PAY ALL COSTS FOR ANY REPAIRS. The dealer assumes no responsibility for any repairs regardless of any oral statements about the vehicle.
> . . . .
> PRE PURCHASE INSPECTION: ASK THE DEALER IF YOU MAY HAVE THIS VEHICLE INSPECTED BY YOUR MECHANIC EITHER ON OR OFF THE LOT.
>
> SEE THE BACK OF THIS FORM for important additional information, including a list of major defects that may occur in used motor vehicles.

The back of the signed "buyers guide" stated, "Below is a list of some major defects that may occur in used motor vehicles," and set forth an exhaustive list of potential defects, including transmission and suspension problems. The day Burrow purchased the vehicle, he left it at Main Street Motors for the agreed CV joint repair and the stripe work. Three days later, he picked up the vehicle and, while the engine was cold, he "put it in reverse [and] it had a very loud sound" that lasted five to ten seconds. He then put the car in reverse in front of Rick Meadows, inquiring what the noise was, to which Meadows stated, "Well, I've never heard that before." At that point, Burrow recognized that he didn't "have any proof that it didn't happen just now or yesterday," and he drove away with the car. Thereafter, the problem did not go away, and the sound "happened every single time you put it in reverse when it was cold." Furthermore, the next day or two days later, Burrow noticed another clicking sound that occurred when the engine is cold. As soon as Burrow was able, he contacted Rick Meadows about the problems and requested to return the car. Ultimately, however, Main Street Motors refused to allow Burrow to rescind the purchase.

4

After recalling that Main Street Motors had originally purchased the vehicle from Gary Force Acura, Burrow contacted Gary Force Acura and learned that the problem, which was a transmission problem, had existed even before Main Street Motors purchased the vehicle. Burrow further learned that other problems existed with the car that had not been repaired, including among other things the need for ball joints to be replaced. Ultimately, Burrow traded in the Legend eight months after he had purchased it (and after he had increased its total mileage by approximately 10,000 miles) for $1,500.

At the end of Burrow's direct examination, Burrow explained to the circuit court that his "main witness" had not been present at the general sessions trial, and that he hadn't expected to prevail if his "main witness did not show up." Thereafter, Barr's counsel began cross-examining Burrow. Before he was through, however, and (more importantly) prior to Burrow having any opportunity for his counsel to conduct any redirect examination, the circuit court judge curtailed cross-examination, stating the following:

> I have a suggestion. [Burrow] has said that he has a very good witness that was not heard. I'd like to hear from that witness, then I will allow you to cross-examine more if you need to.

Neither party expressed any objection to this procedure, and, therefore, Burrow's counsel called Steve Bowman to testify. During direct examination, Bowman testified that he was a service manager at Gary Force Acura, that he was personally familiar with the 1988 Acura Legend that was the subject of this suit, and that the car's transmission made a loud grinding sound that lasted 10 to 15 seconds when he had moved the car prior to its sale to Main Street Motors. Gary Force Acura "had already checked the car out" and had come up with a $2,300 estimate for varying repair work, *excluding* the internal transmission "grinding." Repairing the transmission was estimated to cost over $2,000 more. Based upon the car's overall condition, Bowman recommended that Gary Force Acura "wholesale" the car, rather than put the car on its lot for sale. During direct examination, Bowman also opined that the "repairs" of which he was aware would "affect the value of the vehicle." He further opined that the grinding transmission problem that appeared when the engine is cold would not have disappeared for the subsequent one month period of time during which Main Street Motors had the car in its possession.

5

The transcript of proceedings from the May 21, 1998 trial does not indicate whether Burrow's counsel completed his direct examination of Steve Bowman. The following, however, is the remaining exchange that occurred immediately following Bowman's testimony on direct examination:

THE COURT: I think we need to take a break.

(Break in proceedings.)

THE COURT: Mr. Woodall [who was Barr's trial counsel], I've heard enough proof to make a decision, and I dismiss both actions. I hope it's not considered that I'm tired or weary, but this doesn't fit into the criteria of that exhibited under the Consumer Protection Act.

The original action is dismissed and the cross-action is dismissed. Mr. Woodall, would you prepare the order, please?

MR. WOODALL: Certainly, sir.

(End of Proceedings.)

Accordingly, on June 1, 1998, the circuit court entered a judgment that provided:

After hearing the testimony presented and considering the exhibits admitted into evidence, the Court was of the opinion and found that ... Burrow take nothing from ... Barr ... ; that ... Barr ... take nothing from ... Burrow; and that the costs of this cause should be adjudged against ... Burrow.
IT IS, THEREFORE, ORDERED, ADJUDGED, and DECREED by the Court that this action should be, and is hereby, dismissed as to all parties with all costs of this cause taxed against ... Burrow, for which execution may issue, if necessary.

On appeal, Burrow contends that "the trial court erred in *sua sponte* ordering the involuntary dismissal" of Burrow's claims, and further contends that "the evidence presented at trial preponderated against the trial court's decision."

### ANALYSIS

In Burrow's brief, he states,

The trial judge dismissed the action before [Burrow] had completed presenting his proof. In fact, [Burrow] still had two witnesses under subpoena and [Barr] who remained to be called to testify. The trial court . . . dismissed [Burrow's] action prior to the presentation of all [Burrow's] proof . . . . [Burrow] had not rested or closed his proof.

It is apparent from our review of the record that Burrow indeed had not rested or completed

his case in chief. Quite simply stated, Burrow was not afforded an opportunity to attempt to fully present the facts and his evidence (subject to objections as to the admissibility of evidence). The trial judge simply curtailed any further opportunity for Burrow either to attempt to introduce additional testimony prior to the completion of his case in chief, or even to explain why further testimony might be necessary and/or appropriate. In reviewing the propriety of the trial court's *sua sponte* dismissal at this stage in the proceedings, we find ourselves guided, in part, by Harris v. Baptist Memorial Hospital, 574 S.W.2d 730 (Tenn. 1978), wherein the Tennessee Supreme Court reviewed the propriety of a trial court's *sua sponte* dismissal after hearing only opening statements from counsel. In Harris, our supreme court stated the following:

> Although Rule 41.02 does not expressly so provide, we are of the opinion that <u>a trial court may</u> under certain circumstances and upon adequate grounds therefor, *sua sponte* <u>order the involuntary dismissal of an action</u>. However, this power must be exercised most sparingly and with great care that the right of the respective parties to a hearing shall not be denied or impaired. It must be remembered that Rule 41.02(3), *Tennessee Rules of Civil Procedure*, provides that all dismissals, except those for lack of jurisdiction, improper venue or lack of an indispensable party, shall operate as an adjudication upon the merits unless the court in its order of dismissal otherwise provides. In short, the occasions for the proper exercise of this power are considered by this Court to be few indeed.

> We are of the opinion, however, that the trial judges of this State are not authorized to order the involuntary dismissal of an action at trial upon the sole basis of the opening statements of counsel. Such a practice was not recognized in this State prior to the adoption of the *Tennessee Rules of Civil Procedure* and we find nothing in those rules to countenance such a practice now. The applicable rule is Rule 41.02(2), governing involuntary dismissals at trial, which provides:

>> "After the plaintiff, in an action tried by the court without a jury, has <u>completed the presentation of his evidence</u>, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence; in the event judgment is rendered at the <u>close of plaintiff's evidence</u>, the court shall make findings of fact if requested in writing within three days after the announcement of the court's decision."

> Clearly, this rule contemplates that the plaintiff's evidence shall be heard and evaluated by the court prior to an involuntary dismissal order at trial. We note also that Rule 50.01 governing the granting of a directed verdict in a jury trial also limits the power of the court to do so to that point in the trial " . . . at the <u>close of the evidence</u> offered by an opposing party or at the close of the case."

> Of critical importance here is the nature of opening statements. They

7

are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove. Such statements do not amount to stipulations and certainly are not a substitute for the pleadings or for evidence. See 75 Am.Jur.2d Trials s 202 (1974). It is easy to see that an <u>involuntary dismissal upon the basis of the opening statements of counsel alone may effectively deny the litigants the opportunity to be heard or to fully present the facts and evidence in the case</u>. For this reason, we are unwilling to expand the provisions of Rule 41.02 to authorize trial judges to order involuntary dismissals upon opening statements only.

574 S.W.2d at 731-32 (emphasis added). While <u>Harris</u> clearly recognizes "that a trial court may . . . *sua sponte* order the involuntary dismissal of an action," it further sets forth the proposition that a litigant should not be denied the opportunity to be heard or to fully present the facts and evidence in the case. While <u>Harris</u> undoubtedly involved a more egregious denial of a plaintiff's opportunity to fully present the facts and evidence, we nonetheless find that, *under the circumstances of this case*, the trial court similarly erred by denying Burrow the opportunity to fully present the facts and his evidence.

CONCLUSION

Accordingly, we hereby reverse the trial court's dismissal, and remand this case to the trial court for further proceedings consistent with this opinion. Costs on appeal are taxed to Barr, for which execution may issue if necessary.

8

HIGHERS, J.

CONCUR:

_____
CRAWFORD, P.J., W.S.


_____
FARMER, J.

CRAWFORD, P.J., W.S.